95 So.2d 82

**Louise S. CHAMPION as Tax Assessor of
Montgomery County, et al.**

**v.**

**James McLEAN et al.**

3 Div. 786.

Supreme Court of Alabama.

April 25, 1957.

**104**

John Patterson, Atty. Gen., Wm. F. Thetford, Circuit Solicitor, Montgomery, Willard W. Livingston and Arthur Joe Grant, Asst. Attys. Gen., for appellants.

Rushton, Stakely & Johnston and John B. Scott, Montgomery, and Preston C. Clayton, Eufaula, for appellees.

COLEMAN, Justice.

Appellees, taxpayers and owners of cattle in Montgomery County, filed a bill in equity for declaratory judgment and respondents filed demurrer. Demurrer of appellants was overruled and counsel for both parties stipulate that the facts alleged in the bill are true, and that the questions for decision are solely questions of law which may be determined from appellees' bill for declaratory judgment.

The circuit court rendered a decree construing the statutes involved in accordance with appellees' contentions. From that decree, this appeal is taken and the rulings of the circuit court are assigned as error.

The question regarding the existence of a justiciable controversy was raised by the demurrer. In overruling the demurrer, the trial court held that such a controversy did exist. The correctness of this ruling is one assignment of error, but we pretermit con-

sideration thereof because appellants state in brief:

"Although this ruling is assigned as error, no argument will be made with respect thereto as the parties concerned are desirous of a declaration of the law by this Court on the legal questions involved."

The appellants, as tax officials, contend that all cattle are subject to ad valorem tax by virtue of the provisions of Title 51, § 21 (e), Code 1940, except as specifically exempt under Title 51, § 2(j), Code 1940.

Appellees contend that all cattle raised on the farm in the hands of the original producer are "products raised on the farm in the hands of the original producers" within the meaning of Title 51, § 21(d), Code 1940, and that cattle remaining in the hands of the original producer thereof are "agricultural products" within the meaning of Title 51, § 2(h), Code 1940. Appellees further contend that cattle which have been raised or grown in the State of Alabama and which remain in the hands of the producer thereof, or his landlord, or in the hands of a co-operative association for all time, and for a period of one year in the hands· of the purchaser of said cattle, are exempt from ad valorem taxation under Title 51, § 2(h), Code 1940.

The decree appealed from recites that it is:

"Ordered, Adjudged, Declared And Decreed by the Court as follows:

"1. That cattle raised on the farm in the hands of the original producer are products raised on the farm in the hands of the original producer within the meaning of subsection (d), Section 21, Title 51, Code of Alabama of 1940.

"2. That cattle remaining in the hands of the original producers thereof are agricultural products within the meaning of Subsection (h), Section 2, Title 51, Code of Alabama of 1940 as amended.

"3. That cattle which have been raised or grown in the State of Alabama and which remain in the hands of the producer thereof, or his landlord, or in the hands of a co-operative association for all time, and for a period of one year in the hands of the purchaser of said cattle, are exempt from ad valorem taxation."

The above rulings of the circuit court are assigned as error and argued on this appeal. The sole question for decision by this court is the correctness of the above rulings of the circuit court.

Part One—Subsec. (d), § 21, Title 51

Paragraph 1. of the decree below declared that cattle raised on the farm in the hands of the original producer are products raised on the farm in the hands of the original producer and are therefore tax exempt, within the meaning of Subsection (d) § 21, Title 51 Code 1940.

The pertinent subsections of § 21, Title 51 Code 1940, recite as follows:

"§ 21. Enumeration of subjects of taxation.—The subjects of taxation, *except as exempted by law,* shall be as follows: * * * (d) All stocks of goods, wares and merchandise, *the assessment* to be on the average amount on hand during the preceding year, except in cases where business is commenced on or after October 1 of a current year, and in such cases *the assessment* to be on the capital actually employed in the business and apportioned as hereinafter provided, but the *amount* so *assessed* for any whole year shall in no case be less than the capital actually employed in the business, and this *shall include all goods, wares and merchandise kept on plantations* or elsewhere, or by railroad companies or persons, *for sale* or *to be dealt out to laborers* or employees *for profit,* or *on account of their wages,* and shall include all goods, wares and merchandise offered for sale by any person commencing business subsequent to the first day of

October of a current year, but in such case the tax shall be apportioned according to the date at which the business was commenced, so that if commenced after the first day of January the tax shall be three-fourths of the tax for the whole year; if commenced after the first day of April the tax shall be one-half of the tax for the whole year; provided that *the assessment herein provided for shall not include products raised on the farms in the hands of the original producers.* If the person, association or corporation, receiver or trustee carrying on such business shall fail to make return of the amount of stock of goods, wares and merchandise as provided by law, or if the county tax assessor is not satisfied with the return made, in order to make *proper assessment,* he shall have the right to demand a copy of the last *inventory* made of such stock of goods, wares or merchandise, and may also by inquiry of persons believed to have knowledge of the subject obtain information as to the probable average amount of such stock, and from such information may *assess* the same upon his best judgment. (e) All household and kitchen furniture, mechanical and electrical refrigerators, libraries, jewelry, precious stones, plate and silverware, ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold, silver and other watches and gold and other safety chains, all wagons and other vehicles; all motor cars, automobiles, trucks, busses, tractors and motorcycles and other motor vehicles, and bicycles; all outboard motors; all airplanes, airships and other aircraft, and aircraft landing fields and equipment; all typewriters; all cash registers; all calculating machines; all bookkeeping machines, teletypes, dictaphones and other recording or sending apparatus or machines, all phonographs and all machines of like character; all radio sending and receiving sets and appliances; all iron safes and cabinets, all store fixtures, all office furniture and fixtures, all mechanical tools and farming implements; all tanks, all storage reservoirs or basins; all golf bags, golf sticks and all other sporting goods, all pistols and guns, *all cattle* and horses, mules, studs, jacks, and jennets; all hogs, sheep, and goats, *except as specifically exempted;* all x-ray machines, all lense grinding machines, all eye testing machines, all surgical instruments and all other instruments or appliances used in surgical, dental, medical, optometrical or other professional work. * * *." (Emphasis supplied.)

The subsections quoted above from the 1940 Code are the same, without any material change, as Subsections (d) and (e) of § 10 of Act No. 194, Acts 1935, page 256, entitled "An Act To Provide For The General Revenue Of The State of Alabama."

Stripped of phrases and clauses not essential to this decision, the pertinent provisions of Subsections (d) and (e) of § 21, Title 51 Code 1940, read as follows:

"21. The subjects of taxation, *except as exempted by law,* shall be as follows: * * * (d) All stocks of goods, wares and merchandise, *the assessment* to be on the average amount on hand during the preceding year, * * * and this shall include all goods, wares and merchandise kept on plantations * * * for sale or to be dealt out to laborers * * * for profit, or on account of their wages * * * provided that *the assessment herein provided for* shall not include products raised on the farms in the hands of the original producers. If the person, * * * carrying on such business shall fail to make return of the amount of * * * goods, wares and merchandise * * * *the county tax assessor* * * shall have the right to demand a copy of the last *inventory* made of such stock of goods, wares or merchandise,

* * * and from such information may assess the same upon his best judgment. (e) All household and kitchen furniture, * * * all * * * farming implements; * * * *all cattle* and horses, mules, studs, jacks, and jennets; all hogs, sheep, and goats, *except as specifically exempted;* * * *." (Emphasis supplied.)

Subsection (d) which is set out above, as it appears to us, is clearly intended to relate to the assessment of "all stocks of goods, wares and merchandise," kept for sale, etc. The proviso of said Subsection (d) relied on by appellees, appears at the end of a sentence which begins with the words "All stocks of goods, wares and merchandise."

The next and last sentence of the subsection provides that in the event the person "carrying on such business shall fail to make return of the amount of stock of goods, wares and merchandise as provided by law, or if the county tax assessor is not satisfied with the return made, * * *," he may proceed in the manner there indicated to obtain information so as to assess the "amount of such stock of goods, wares or merchandise" upon his best judgment.

▉ It appears to us that this subsection was intended by the legislature to deal with a mercantile business. The subjects of taxation mentioned therein are designated by words commonly used to designate the articles or assets owned by persons engaged in the mercantile business or operating a retail store. The subsection provides "* * * this shall include all goods, wares and merchandise kept on plantations or elsewhere, * * * for sale or to be dealt out to laborers or employees for profit, or on account of their wages, * * *."

▉ It is common knowledge that on plantations in 1935, and long prior thereto, the owners or operators of such plantations, in many cases, operated a "store" for the convenience of tenants or wage hands, as well as others. It is also common knowl-edge that in some of those plantation stores, meat, corn meal, lard, and other farm raised commodities were kept in the store for sale or issue to tenants or wage hands, or others. It would appear reasonable to conclude that it was the intention of the legislature to exclude from the taxable inventory of these plantation stores, such merchandise carried in stock as may have been produced on the farm which was served by this mercantile establishment.

We think it plainly evident that it was not the intention of the legislature to include "live cattle" in the assessment exemption proviso therein set out. It would appear unreasonable to conclude that live cattle would be a part of the "goods, wares and merchandise" of a mercantile establishment.

Bacon, corn meal, syrup, lard or side meat produced on the farm, might appear in the stock of goods of the plantation store. By the quoted proviso, the legislature intended to exempt from ad valorem tax, such products made from animals and crops produced and processed on a farm, and carried in the stock of goods in the farm store. It does not follow, however, that the legislature intended, by this proviso, to exempt the live animals on such farms from ad valorem tax. Live cattle on the farm would not ordinarily appear in the inventory of a plantation store. "* * * all cattle" not specifically exempted would be assessed and taxed under Subsection (e) of § 21.

The record of the origin and history of Subsection (d) of § 21, Title 51, supports and confirms the foregoing conclusion.

Act No. 1, Acts of 1865–66, page 3, in § 2 recites in pertinent part:

"Sec. 2. * * * That taxes are to be assessed by the assessor in each county, on and from the following subjects, and at the following rates, to-wit:

* * * * * *

"On all stocks of goods, wares, or merchandise on hand, to be assessed upon the largest amount on hand at any one period during the tax year; and

this shall include all merchandise kept on plantations for sale or to be dealt out to laborers;

"On all horses and mules not used strictly for agricultural purposes, except studs, jacks and race horses;

"On all meat cattle, on the excess over five head;

" * * * one-fourth of one per cent. *ad valorem.*"

The foregoing provision taxing stocks of goods, wares, and merchandise, including merchandise on plantations, has been carried forward in many subsequent legislative acts. See: 1866–67 Acts, page 259; 1868 Acts, page 297, § 6(4); 1874–75 Acts, page 3, § 5(4); 1875–76 Acts, page 43, Chapter III, § 4(4); Act No. 61, 1882–83 Acts, page 67, § 5(4) adds the provision that the tax shall be apportioned according to the date when the business commenced, and in pertinent part recites as follows:

"4. All stocks of goods, wares and merchandise, the assessment to be upon the average amount on hand during the preceding year, but the amount so assessed shall in no case be less than the capital actually employed in the business; and this shall include all goods, wares and merchandise kept on plantations or elsewhere, or by railroad companies, or manufacturing companies, or other associations, corporations or persons for sale or to be dealt out to laborers or employees for profit, or on account of their wages, and shall include all goods, wares and merchandise offered for sale by any person commencing business subsequently to the first day of January of the current year, but in the case last above named, the tax shall be apportioned according to the date at which the business shall be commenced, so that if commenced after the first day of April, the tax shall be three-fourths of the tax for the whole year; if commenced after the first day of July, the tax shall be one-half of the tax for the whole year, * * *."

The Supreme Court held Act No. 61, supra, void for reasons not here important, but the provisions quoted from § 5(4), supra, were carried without substantial change into 1884–85 Acts, page 3.

Act No. 559, 1894–95 Acts, page 1162, introduced for the first time, so far as we have found, the proviso here important, which is to the effect that the assessment shall not include products raised on the farms in the hands of original producer, and in pertinent part recites:

"4. All stocks of goods, wares and merchandise, the assessment to be upon the average amount on hand during the preceding year, but the amount so assessed shall in no case be less than the capital actually employed in the business *nor less than sixty-six and two-thirds per cent of the originally invoiced price of said goods, wares and merchandise to be taken and furnished to the tax assessor as hereinafter provided,* and this shall include all goods, wares and merchandise kept on plantations or elsewhere or by railroad companies or manufacturing companies or other associations, corporations or persons, for sale or to be dealt out to laborers or employees for profit, or on account of their wages; and shall include all goods, wares and merchandise offered for sale by any person commencing business subsequently to the first day of January of the current year, but in such case the tax shall be apportioned according to the date at which the business shall be commenced, so that if commenced after the first day of April, the tax shall be three-fourths of the tax for the whole year; if commenced after the first day of July, the tax shall be one-half of the tax for the whole year; *provided that the assessment herein provided for shall not include the products raised on the farms and in the hands of the original producer.* * * *." (Emphasis supplied.)

Later acts repeated these provisions, without substantial change, but did change the method of valuation with reference to invoice price and capital employed. See: 1898–99 Acts, pages 48, 164; 1903 Acts, page 184; 1915 Acts, page 386; 1919 Acts, page 282; and the language in § 10(d) of 1935 Acts, page 256, is identical, except for spelling, with Subsection (d) of § 21, Title 51, Code of 1940, which is presently the law in point in the instant case.

Paragraph 1. of the decree appealed from, held that cattle in the hands of the producer are exempt from ad valorem tax within the meaning of Subsection (d) of § 21. For the reasons set out, we are of opinion that this was error.

Part Two—Subsec. (h), § 2, Title 51

Paragraphs 2. and 3. of the decree appealed from rest on a construction of Subsection (h) of § 2, Title 51, Code 1940, and declare that cattle in the hands of the original producers, and for one year in the hands of the purchaser of said cattle, are argicultural products within the meaning of Subsection (h) of § 2, and are, therefore, exempt from ad valorem taxation.

The correctness of this holding depends on a construction of Subsection (h) of § 2, in its proper relation to the other provisions of the tax laws. In undertaking this construction, we are to be guided by certain principles and rules of statutory construction. We will hereinafter set out those thoughts to be applicable to the instant case.

The fundamental rule of construction of statutes is to ascertain and give effect to the intention of the legislature as expressed in the statute. This rule hardly requires citation of supporting authority, but see Weill v. State, 250 Ala. 328, 333, 34 So.2d 132, 136, where Livingston, now Chief Justice, speaking for this court, said:

"In the interpretation of statutes, the legislative will is the all important or controlling factor, and it has been frequently stated, in effect, that the intent

of the legislature constitutes the law. [Citations omitted.]"

Again, this court has said:

" * * * The whole statute under construction, as well as others, must sometimes be looked to, to ascertain the true meaning and intent. * * * " City of Birmingham v. Southern Express Co., 164 Ala. 529, 538, 51 So. 159, 162, cited in Street v. Cloe, 207 Ala. 631, 93 So. 591.

" * * * Each statute which constitutes a part of a system of laws should, if practicable, be so construed as to make the system consistent in all its parts; each is thus considered a part of the whole." City of Birmingham v. Southern Express Co., supra.

The decree below determined that the term "agricultural products," as used in the statute, included cattle. We have no difficulty in agreeing that the term "agricultural products" may properly be construed to embrace cattle when the intent to include cattle appears from the time, manner, and place in which the term is used. Likewise, horses, mules, hogs, sheep, goats, poultry, and other animals produced on the farm might be included within the meaning of the term "agricultural products," when such an intent appears to be the sense in which the words "agricultural products" are employed. See Dillard v. Webb, 55 Ala. 468.

The question here to be determined, however, is not merely: Does the term "agricultural products" include cattle or livestock, as an abstract proposition, but, as aptly stated by the trial court, the question is:

"2. Are cattle remaining in the hands of the original producers thereof, agricultural products within the meaning of Subsection (h), Section 2, Title 51, Code of Alabama of 1940?"

In seeking the answer to this question, Subsection (j) of § 2 cannot be ignored.

Pertinent subsections of § 2 of Title 51, Code 1940, recite as follows:

"§ 2. The following property and persons shall be exempt from ad valorem taxation *and none other*: * * * (h) All cotton or agricultural products which have been raised or grown in the State of Alabama, and which shall remain in the hands of the producer thereof, or his landlord, or in the hands of a co-operative association for all time, and for a period of one year in the hands of the purchaser or the manufacturer. (i) All cotton, wherever grown, stored in licensed warehouses in the State of Alabama for a period not exceeding twelve months. (j) Provisions and supplies on hand for the current year for the use of the family and the making of the crops; all wearing apparel; farming tools to the value of one hundred dollars; tools and implements of mechanics to the value of one hundred dollars; and the following property to be selected by the head of each family; namely, two mules or two horses, two cows, two calves, ten hogs, twenty sheep, twenty goats, household and kitchen furniture not to exceed in the aggregate two hundred and fifty dollars and one sewing machine. * * (m) All manufactured articles including pig iron, in the hands of the producer or manufacturer thereof, when stored at or near the place of manufacture or within the county where same was manufactured or produced, shall be exempt from taxation for twelve months after its production or manufacture. * * * (o) All poultry raised or kept by any person and of value not more than one hundred dollars. * * *." (Emphasis supplied.)

Appellees contend that Subsection (h) is intended to exempt from taxation cattle in the hands of a producer, while Subsection (j) is intended further to exempt two cows and two calves, and the other animals there enumerated, produced by any person, and in the hands of any person.

If that were the legislative intent as to the livestock enumerated in Subsection (j),

the legislature could have easily so expressed that intent by the insertion of the words, "raised by any person," or words of like effect, in Subsection (j).

The legislature did that in § 2 in two instances, in dealing with items which would be "agricultural products" within the meaning of that term as contended for by appellees.

Subsection (h) expressly provides that "cotton" raised or grown in Alabama, in the hands of the producer shall be exempt. Subsection (i) lists as an exempt article "All cotton, wherever grown, stored in licensed warehouses in the State of Alabama for a period not exceeding twelve months."

Under appellees' definition of "agricultural products," poultry would be included, and if appellees are correct, poultry in the hands of the producer would be exempt under Subsection (h). Yet the legislature expressly dealt with the exemption of poultry under Subsection (o), which specifies as exempt:

"(o) All poultry raised or kept by any person and of value not more than one hundred dollars."

If the legislature did intend to create two classes of exempt livestock, as contended by appellees, we can only conclude that the language of the statute fails to express that intention.

" * * * 'Courts can only learn what Legislature intended by what it has said, and have no right to stray into mazes of conjecture or search for an imaginary purpose, in construing statute.' * * *" Dixie Coaches v. Ramsden, 238 Ala. 285, 288, 190 So. 92, 94, and cases there cited.

This court has also said:

" * * * that the correct rule appears to be that where the intent or meaning of tax statutes, or statutes levying taxes, is doubtful, they are, unless a contrary legislative intention appears, to be construed most strongly

against the government, and in favor of the taxpayer or citizen. * * *" Paramount-Richards Theatres v. State, 256 Ala. 515, 525, 55 So.2d 812, 820.

§ 2 of Title 51, however, is not a statute levying taxes, but is a statute granting an exemption from taxes. To statutes of this kind, a different rule of construction applies. This court has said:

" * * * exemptions from taxation are strictly construed against the taxpayer and in favor of the state * *." Carter Oil Co. v. Blair, 256 Ala. 650, 655, 57 So.2d 64, 68; Pullman-Standard Car Mfg. Co. v. State, 253 Ala. 638, 46 So.2d 500; State v. Wertheimer Bag Co., 253 Ala. 124, 43 So.2d 824; Touart v. American Cyanamid Co., 250 Ala. 551, 35 So.2d 484.

This rule has also been expressed in the following language:

" * * * 'The "universal rule of construction is that exemptions from taxation, whether statutory or constitutional, are to be strictly construed, against the exemption and in favor of the right to tax, and that no person or property is to be exempted unless the intention to exempt such person or property clearly appears in some statute or constitutional provision."' " State v. Bridges, 246 Ala. 486, 489, 21 So.2d 316, 317, 159 A.L.R. 678.

See also, Title Guarantee Loan & Trust Co. v. Hamilton, 238 Ala. 602, 604, 193 So. 107, 108, where the court said:

" * * * It may be well to here note that appellant, seeking an exemption from taxation, assumes the burden to clearly establish the right. In all cases of doubt as to legislative intention, the presumption is in favor of the taxing power. * * *"

The reason for the rule of strict construction against exemptions was stated by this court speaking through Gardner, C. J., as follows:

"In considering the exemption feature of the statute we should bear in mind the universally recognized rule that taxation is the rule and exemption the exception and that the *legislative intent to release property* from its just proportion of the public burden '*ought to be expressed in clear and unambiguous terms;* it ought not to be deduced from language of doubtful import.' * * *" (Emphasis supplied.) Curry v. Reeves, 240 Ala. 14, 15, 195 So. 428, 430.

Appellees appear to concede that the statutes under construction are ambiguous, at least to the extent of sustaining the right of appellees to have a declaratory judgment in this case. We quote from appellees' brief:

" * * * There is a justiciable controversy between the Appellants, Alabama taxing officials, and Appellee taxpayers. There is ambiguity in the *phraseology* of Title 51, Section 21, the Ad Valorem Levying Section, and *there is ambiguity in the meaning of pertinent exemption subsections of Title 51, Section 2, the Exemption Statute for Ad Valorem Taxes.* Without going further than Exhibits 'A' and 'B' to Appellees' Bill for Declaratory Judgment, *the ambiguity is apparent on the record.* * * *." (Emphasis supplied.)

A further principle of construction is due to be applied to Subsections (h) and (j) of § 2.

Speaking through Livingston, J., now C. J., this court has said [250 Ala. 328, 34 So. 2d 137]:

"The maxim 'expressio unius est exclusio alterius,' though not a. rule. of law, is an aid to construction. It has application when, in the natural association of ideas, that which is expressed is so set over by way of contrast to that which is omitted that the contrast enforces the affirmative in-

ference that that which is omitted must be intended to have opposite and contrary treatment. A statute often speaks as plainly by inference as in any other manner, and it is a general rule that that which is clearly implied from the express terms of a statute is as much a part thereof, and is as effectual as that which is expressed. * * *" Weill v. State, supra.

■ According to this rule of construction, where a statute enumerates certain things on which it is to operate, the statute is to be construed as excluding from its effect all those things not expressly mentioned. 82 C.J.S. Statutes § 333, p. 666.

This rule of construction is not a technical or arbitrary rule. It is applied by people in all walks of life every day in their ordinary affairs. Perhaps the best illustration can be drawn from traffic signals.

At street intersections, motorists frequently encounter a traffic sign which recites: "NO LEFT TURN." Such a sign does not mention "RIGHT TURN," yet, the motorist immediately infers that right turns are permitted at such an intersection because they are not mentioned on the sign, and, therefore, are intended to be excluded from the prohibition expressly stated against left turns. If both right turns and left turns are prohibited, the sign recites "NO TURN."

Another common sign at intersections is "TURN RIGHT ON RED." LEFT TURNS are not mentioned, but the motorist does not infer that he is permitted to turn left on the red light. On the contrary, he infers that left turns, because they are not mentioned, receive opposite treatment, and are not permitted on the red light.

Subsection (e) of § 21, levies ad valorem tax on all cattle and horses, mules, studs, jacks, jennets, hogs, sheep, and goats, "except as specifically exempted."

Subsection (j) of § 2 specifically exempts from ad valorem tax: two mules or two horses, *two cows, two calves*, ten hogs, twenty sheep, and twenty goats.

By these two subsections, the legislature has clearly expressed an intent that the specified numbers of animals therein named shall be treated as tax exempt. The ordinary and reasonable inference is that all animals of the kinds taxed, in excess of the number expressly exempted, shall receive tax treatment opposite and contrary to the treatment accorded to the specified numbers declared exempt.

As applied to cattle, these Code sections clearly express a legislative intent to exempt from taxation the four head of cattle there specified, that is, two cows and two calves. The reasonable inference, therefore, is that the legislative intent was not to exempt any cattle not expressly exempted, and that all cattle of one owner in excess of two cows and two calves are subject to ad valorem tax.

We are unable to conclude that the statute clearly expresses a legislative intent to exempt from taxation all cattle in the hands of the original producer, or that appellees have supported the burden which they assumed when they undertook to establish their right to the tax exemption which they have claimed.

History of Subsecs. (h) and (j), § 2, Title 51

"The genesis of the statute here involved * * * may be looked to in aid of its construction." Baggett v. Jackson, 244 Ala. 404, 13 So.2d 572, 573; Acme Freight Lines v. City of Dothan, 242 Ala. 468, 6 So.2d 595.

The earliest Alabama statute taxing or exempting cattle appears to be an act approved December 27, 1822, Acts of 1822, page 98, which in pertinent part recites:

"* * * for every horse kept exclusively for the saddle or pleasure carriage, one dollar; and for every race horse, five dollars; * * * for every stud horse or jack ass, the

amount for which said stud or jack may stand by the season; and *all neat cattle* which may be owned by any one citizen of this state, and for every head of neat cattle owned by any person not a citizen freeholder of this state, *over twenty-five head, work oxen excepted,* per head, four cents; \* \* \*." (Emphasis supplied.)

An act approved in 1827 levies a tax on:

" \* \* \* all neat cattle \* \* \* over twenty-five head, work oxen excepted, per head, one and a half cents; \* \* \*." Acts of 1827, page 11.

Later tax statutes followed the same pattern and taxed all cattle owned by any one person in excess of a specified number. See Acts of 1843, page 3; Acts of 1848, page 3; Acts of 1849–50, page 3; Acts of 1862, page 3; and Acts of 1865–66, page 3.

Act No. 260, Acts of 1866–67, page 259, levied a tax "On all cattle on the excess over five head," and contains an exemption proviso as follows:

"*Provided,* No hogs, sheep, goats, or poultry, kept or raised for the use of any family, or work oxen, or animals used for agricultural purposes exclusively, \* \* \* shall be taxed by this act."

Act No. 1, 1868 Acts (November Session), page 297, exempted from taxation "To every head of a family personal property to the value of five hundred dollars," and required every person to make a statement to the assessor setting forth "all the real and personal property not by this act exempt," including among other things, the number of cattle, mules, horses, sheep, goats, and hogs over six months old.

### Act No. 1, 1875–6

Act No. 1, approved March 6, 1876, 1875–6 Acts, page 43, entitled "An Act To establish a Revenue Code for the State of Alabama" set the pattern for revenue acts, which has been followed up to the present time with respect to ad valorem taxation of cattle and other farm animals.

The pertinent provisions of said act are as follows:

### "Chapter II.—Exemptions From Taxation.

" \* \* \* the following persons and property shall be exempt from taxation:

"8. The following property, to be selected by the head of each family, viz: Household and kitchen furniture, not to exceed in value one hundred and fifty dollars; one yoke of oxen; one cart or wagon; two cows and calves; twenty head of stock hogs; ten head of sheep; all poultry; all corn, provisions and supplies on hand for the current year for the use of the family and the making of the crop; all wearing apparel; all looms and spinning wheels kept for use in the family; farming tools to the value of twenty-five dollars; tools and implements of mechanics to the value of twenty-five dollars."

### "Chapter III.—Tax Year Defined— Subjects of Taxation—Rate—Description and Valuation Thereof

"Sec. 4. That every person required by this act to make or deliver such statement shall set forth under oath, to be in every instance administered by the assessor before the listing of his, her or their property, an account of the property held or owned by him or them, whether exempt from taxation or not, as follows; and upon the several items of property so named, *except when so much thereof is exempt from taxation under the provisions of section one of chapter two of this act,* there is hereby levied a tax at the rate of seventy-five cents on each one hundred dollars of the value thereof:

"5. Upon the value of all household furniture, libraries, jewelry, plate, and

silverware ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold and silver watches, and gold safety-chains, upon all wagons, or other vehicles; all mechanical tools and farming implements; all dirks and bowie-knives, sword-canes, pistols and guns; upon all cattle, horses, mules, studs, jacks and jennets, and race horses; all hogs, sheep and goats." (Emphasis supplied.)

These sections of the 1875–6 Act clearly express an intent that all cattle shall be taxed, except "so much thereof is exempt * * * under the provisions of section one of chapter two." 1 yoke of oxen and 2 cows and calves are exempt under section one of chapter two. Therefore, under this act, all cattle except the number of oxen, cows, and calves, expressly mentioned in section one of chapter two were subject to taxation.

Chapter II of said Act No. 1 listing tax exempt property was codified as § 358, Code of 1876.

The provisions of § 4 of Chapter III of said act setting the tax rate at seventy-five cents per one hundred dollars was changed by the legislature before the 1876 Code was completed. By an act approved February 8, 1877, Acts of 1876–7, page 3, the tax rate was set at seven-tenths of one percent, and the latter act was codified as § 368 of the 1876 Code.

In the codification process, the above underscored exception contained in Chapter III of Act No. 1, 1875–6 Acts, page 43, which is to the effect that all cattle, etc. are taxed except *"so much thereof is exempt * * * under * * * chapter two"* was omitted from the 1876 Code.

§ 362(5) of the 1876 Code requires a listing for taxation of "all cattle, horses, mules, studs, jacks and jennets and race horses; all hogs, sheep and goats," in the exact language of said Act No. 1, 1875–6 Acts, page 43.

With respect to the matters with which we are here concerned, the levying and exempting provisions of the 1876 Code are the same as Act No. 1, 1875–6 Acts, page 43, except for the omitted exception as hereinabove noted.

At § 357, Code of 1876, a footnote recites:

"Except as otherwise herein referred to, this chapter is taken from the revenue law of March 6, 1876, (Acts 1875–76, p. 43.)"

We are of opinion that the intent and meaning of said Act No. 1 was carried into the 1876 Code in so far as the number of cattle exempted from taxation is concerned. Under that Code, all cattle, except the number specifically exempted, were subject to ad valorem tax.

The provisions of Act No. 1, 1875–6, levying a tax on cattle and other livestock, and exempting two cows and calves, hogs, goats and sheep have been carried into later acts and finally into the Code of 1940, Title 51. See Acts of 1882–83, page 67; Acts of 1884–85, page 3. The provisions levying a tax on "all cattle, horses * * *." etc., of § 4 of Chapter III of Act No. 1, Acts of 1875–6, constitute the origin of that provision of Subsection (e) of § 21 of Title 51, Code 1940, which levies tax on all cattle, etc.

Act No. 328, General Acts 1919, page 282, employs the words: "except as specifically exempted," in the tax levying provisions of that act, in the same manner as said words appear in § 21(e), Title 51, Code 1940. In pertinent part, said Act No. 328 recites as follows:

"§ 5. The subjects of taxation, except as exempted by existing laws, shall be as follows: * * * e. * * * all cattle and horses, mules, studs, jacks and jennets; all hogs, sheep and goats, *except as specifically exempted.* * * *" (Emphasis supplied.)

We are of opinion that the words *"except as specifically exempted,"* which appear in Subsection (e) of § 21, immediately following the word, "goats," have the same meaning and effect as the words *"except when so much thereof is exempt from taxation under section one of chapter two of this act,"* as the latter words appear in said Act of 1875–6.

### Acts approved Dec. 11, 1886

The term "agriculture products" appears to have been used for the first time in two legislative acts which were approved on the same day, December 11, 1886.

Act No. 4, Acts of 1886–87, page 31, amended certain sections of the revenue act of December 12, 1884, and in particular amended the exemption section (which is the progenitor of Subsection (j) of § 2, Title 51), in the part here pertinent, to read as follows:

"Sec. 2. The following persons and property shall be exempt from taxation:

\*   \*   \*   \*   \*   \*

"8. The following property to be selected by the head of each family, viz: household and kitchen furniture, not to exceed in value one hundred and fifty dollars; one yoke of oxen, one cart or wagon, *two cows and calves,* twenty head of stock hogs, ten head of sheep, all poultry, *all agricultural products* of the preceding year which are on hand, in the hands of the producer on the first of January thereafter, provisions and supplies on hand for the current year for the use of the family and the making of the crop, all wearing apparel, all looms and spinning wheels, kept for use of the family, farming tools to the value of twenty-five dollars, tools and implements of mechanics to the value of twenty-five dollars, one sewing machine in each family when the taxable property does not exceed two hundred and fifty dollars; \* \* \*." (Emphasis supplied.)

The exemption statute has treated "two cows and calves" in a generic class separate from "agricultural products" since the first use of the latter term in the exemption statute.

The Senate Journal, 1886–87, page 318, shows that on consideration of the bill which became Act No. 4 of that session of the General Assembly, the Senate inserted the term "agricultural products" by amendment as follows:

"Mr. Brewer offered an amendment, which was adopted, as follows:

"In 11th line of original bill strike out 'corn' and insert 'agricultural products of the preceding year which are on hand in the hands of the producer on the 1st of January, thereafter.'

"The bill was read a third time and passed—yeas 19, nays 8."

The term "agricultural products" was also used by the 1886–87 General Assembly in another exemption statute, Act No. 333 (H.B. 20), 1886–87 Acts, page 757. We must presume the same term had the same meaning in both Acts No. 4 and No. 333, for a different intent does not appear.

"\* \* \* Like terms in related statutes are presumed to have the same meaning, unless a different intent is manifest." Kilgore v. Swindle, 219 Ala. 378, 380, 122 So. 333, 335.

H. B. 20, as first introduced, was entitled "An Act To exempt cotton in the hands of producers from Taxation," and, as first presented, provided exactly for the purpose expressed in its title, and no more.

The House and Senate Journals show that this bill was amended during passage. It appears to have been a controversial bill.

H. B. 20, referred to ways and means committee, at first received an adverse report. H. J., 1886-7, page 1181. On November 29, 1886, the bill was read in the House for a third time and lost, yeas 42, nays 49. H. J., 1886-7, page 255.

On November 30, 1886, the vote was reconsidered, and several amendments offered, all of which were withdrawn or lost in the House, except one, which was later stricken out by the Senate substitute. A motion was made to recommit, and also to refer to a select committee.

After passage by the House, H. B. 20 was sent to the Senate, where a substitute reciting as follows was passed:

"That on and after the 1st day of January, 1887, all cotton and other *agricultural products* which were *raised or grown during the preceding year,* and which shall remain in the hands of the producers thereof on the first day of January of any year, immediately succeeding that in which they were raised, shall be exempted from taxation." (Emphasis supplied.) Act No. 333, Acts of 1886-87, page 757.

The House concurred in the Senate substitute which became the final form of the act approved by the Governor.

The legislature which originated the exemption for "agricultural products" retained the older express exemption of certain animals in specific numbers and amounts, as such specific exemption appeared in previous statutes, and as the same appears in later statutes, even to this day.

Any argument that the legislature of 1886-87 expressed an intent to create two separate classes of exemptions by repeating the same terms in two separate acts is overcome by the fact that later legislatures combined the two original exemptions into one exemption in later acts. See Act No. 328, Acts 1919; Act No. 172, Acts 1923; Extra Session, Acts 1933, page 8; and Acts 1935, page 256, infra. In these later acts exempting "agricultural products," the lawmakers continued to treat "agricultural products" as a separate class from "two cows and calves" as does § 2, Title 51, Code 1940. The meaning which has been retained by the legislature is the meaning which results from such separate treatment which has been retained.

This continued specific exemption of a certain number of named animals, we must conclude, was not inadvertently done.

" * * * The repetition of the enactment of a statute is of itself evidence against inadvertence on the part of the Legislature, * * *." Seward v. Dogan, 198 Miss. 419, 21 So.2d 292, 294; 82 C.J.S. Statutes § 370, p. 846.

We are told that it is our duty to ascertain the meaning of the words at the time they were used by the legislature, and to give the words that same meaning now unless the meaning has changed since that time.

This rule has been pronounced by this court as follows:

"In interpreting statutes, we must endeavor to arrive at the meaning and intention of the legislature, to be gathered from the words they have employed. Words are but the vehicle of thought; and if, since they were employed by the legislature, they have undergone change, or, if the subject they refer to has undergone modification since their employment, we must search for and enforce the sense they bore when the statute was enacted; for such, we must presume, was the intention of the law-making power. * * *." Sikes v. The State, 67 Ala. 77.

The provisions of Act No. 333, exempting "cotton" appears in Subsection (8), § 3907, Code of 1896, where exemptions from taxation are listed. Between the 1886 and 1896 Codes, however, pig iron was added as a tax exempt article, and is listed as exempt in § 3907(8), Code of 1896.

See Act No. 659, § 38, Acts of 1896-97, page 1489, approved February 18, 1897.

Act No. 909, page 122, approved February 23, 1899, exempts "cotton and other agricultural products" and pig iron in hands of producer, and *adds new* exemp-

tion for said articles "in the hands of purchaser," purchasing same for prompt shipment.

See also Acts of 1903, page 184, of like import. The quoted exemptions for cotton and pig iron were carried into Code of 1907 as § 2064, separate from the old exemption provision which is Subsection (8) of § 2061, Code of 1907.

Act No. 464, Acts of 1915, page 386, carries forward the older exemption section and also the separate exemption section for cotton, agricultural products, pig iron and manufactured articles.

In Act No. 328, Acts of 1919, page 282, the exemptions for cotton, agricultural products, and cows, calves, etc. were combined in Subsection (g) of § 2 which exempted:

"(g) All cotton or other agricultural products which were *raised or grown during the current or preceding calendar year*, and which shall remain in the hands of the producer thereof, or his landlord, or in the hands of the purchaser purchasing the same for prompt shipment; provisions and supplies on hand for the current year for the use of the family and the making of the crop; all wearing apparel; farming tools to the value of twenty-five dollars; tools and implements of mechanics to the value of twenty-five dollars; and the following property to be selected by the head of each family and not to exceed in the aggregate one hundred and fifty dollars, namely: cows, calves, hogs, sheep, poultry, household and kitchen furniture, and sewing machines; * * *." (Emphasis supplied.)

Pig iron and manufactured products were removed to Subsection (i) of § 2.

See Act No. 172, Acts of 1923, page 152 (H. 294 Tunstall).

1933 Acts, Extra Session, page 8, and 1935 Acts, page 256, §§ 2(i) and 2(j), are substantially the same as § 2(h) and (j) of Title 51, Code 1940.

Conclusion

We are not convinced that the intent and meaning of "agricultural products" has changed since 1885; and are further of the opinion that in 1886, as used in the exemption statutes, agricultural products did not include cattle. The same language appears in Subsection (h) of § 2, Title 51, and it is, therefore, our duty now to give that language the original meaning and intention it bore when first used by the law-making power.

We are, therefore, of the opinion that the term "agricultural products" as used in Subsection (h) of § 2, Code 1940, was not intended by the legislature to embrace cattle within the exemption there declared. On other occasions when the legislature intended to include "livestock" within the definition of "agricultural products," the intention so to do has been clearly expressed in unambiguous terms. Title 2, §§ 85 and 130, Code 1940.

We have given careful consideration to the statutes here in question, and are not convinced that the statutes show in clear and unambiguous terms that appellees are entitled to the exemption claimed.

The decree appealed from is not in accord with the opinions herein expressed and is reversed.

The parties have indicated that the only questions to be decided on this appeal are questions of law. It does not appear that the bill of complaint can be amended so as to arrive at a different result.

Therefore, a decree is here rendered declaring that all cattle owned by appellees are subject to ad valorem tax except as specifically exempted therefrom by Subsection (j) of § 2 of Title 51, Code 1940.

This court has no power to amend the tax statutes or the exemption statutes. The power to make the law has been committed to the legislature by the Constitution. The only power of this court is to declare the law as enacted by the legisla-

tive branch of government.  Constitution of 1901, §§ 42, 43, 44 and 212.

This court has pronounced the following well established principles:

"(1) The power of taxation is an incident of sovereignty and is possessed by the government without being expressly conferred by the people.

"(2) *The power is purely legislative.*

"(3) So long as no constitutional limitations are exceeded, the Legislature is of supreme authority, and the courts, as well as all others, must obey. [Citations omitted.]

\*     \*     \*     \*     \*     \*

" \*   \*   \*   It is thoroughly well settled that the Legislature has the power to exempt from taxation any kinds or classes of property at its discretion, if not constitutionally restrained therefrom.   37 Cyc. 738–740.  \*  \*  \*." (Emphasis supplied.)   State **v.** Birmingham So. Ry. Co., 182 Ala. 475, 479, 490, 62 So. 77, 79, 82.

Reversed and rendered.

LIVINGSTON, C. J., and SIMPSON and GOODWYN, JJ., concur.