This Court granted certiorari to determine whether the Court of Criminal Appeals *Page 25 
was correct in approving the admissibility of a blood sample taken from the petitioner while he was not under arrest. Concluding that Code of 1975, § 32-5-190 et seq., does not provide the "exclusive means for admitting blood alcohol test results," that court held that such test results were admissible as evidence "when there is probable cause to believe the motorist was driving while intoxicated and exigent circumstances are present," even though the motorist was not lawfully arrested. 513 So.2d 19.
The facts are reported in the opinion below. That opinion relates that, while the petitioner was told by a medical technologist that he "needed" to draw some blood, no evidence of consent to that procedure was shown, nor was there any factual indication that petitioner was incapable of consenting.
The tortuous history of legal intrusions upon the body for evidence of alcohol content is traced in Schmerber v.California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In that case, the United States Supreme Court considered the constitutionality of the withdrawal of a blood sample from an objecting patient in a hospital who had previously been placed under arrest. Rejecting claims that this practice violated the petitioner's right of due process, his privilege against self-incrimination, and his right to counsel, that Court additionally held that the taking of this blood sample was not the product of an illegal search and seizure under the Fourth
and Fourteenth Amendments. We quote from pertinent portions of the discussion on that issue:
 "We begin with the assumption that once the privilege against self-incrimination has been found not to bar compelled intrusions into the body for blood to be analyzed for alcohol content, the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.
 "In this case, as will often be true when charges of driving under the influence of alcohol are pressed, these questions arise in the context of an arrest made by an officer without a warrant. Here, there was plainly probable cause for the officer to arrest petitioner and charge him with driving an automobile while under the influence of intoxicating liquor. The police officer who arrived at the scene shortly after the accident smelled liquor on petitioner's breath, and testified that petitioner's eyes were 'bloodshot, watery, sort of a glassy appearance.' The officer saw petitioner again at the hospital, within two hours of the accident. There he noticed similar symptoms of drunkenness. He thereupon informed petitioner 'that he was under arrest and that he was entitled to the services of an attorney, and that he could remain silent, and that anything that he told me would be used against him in evidence.'
 "While early cases suggest that there is an unrestricted 'right on the part of the government always recognized under English and American law, to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of crime,' Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652; People v. Chiagles, 237 N.Y. 193, 142 N.E. 583
(1923) (Cardozo, J.), the mere fact of a lawful arrest does not end our inquiry. The suggestion of these cases apparently rests on two factors — first, there may be more immediate danger of concealed weapons or of destruction of evidence under the direct control of the accused, United States v. Rabinowitz, 339 U.S. 56, 72-73; 70 S.Ct. 430, 437, 438, 94 L.Ed. 653 (Frankfurter, J., dissenting); second, once a search of the arrested person for weapons is permitted, it would be both impractical and unnecessary to enforcement of the Fourth Amendment's purpose *Page 26 
to attempt to confine the search to those objects alone. People v. Chiagles, 237 N.Y., at 197, 198, 142 N.E., at 584. Whatever the validity of these considerations in general, they have little applicability with respect to searches involving intrusions beyond the body's surface. The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.
 "Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol, the question remains whether the arresting officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test. Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned. The requirement that a warrant be obtained is a requirement that inferences to support the search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' Johnson v. United States, 333 U.S. 10, 13, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436; see also Aguilar v. State of Texas, 378 U.S. 108, 110, 111, 84 S.Ct. 1509, 1511, 1512, 12 L.Ed.2d 723. The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.
 "The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.
 "Similarly, we are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one. Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. See Breithaupt v. Abram, 352 U.S. [432] at 436, n. 3, 77 S.Ct. [408] at 410, 1 L.Ed.2d 448. Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the 'breathalyzer' test petitioner refused, see n. 9, supra. We need not decide whether such wishes would have to be respected.
 "Finally, the record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment — for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an *Page 27 
unjustified element of personal risk of infection and pain.
 We thus conclude that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." 384 U.S. at 768-772, 86 S.Ct. at 1834-36.
An analysis of Schmerber reveals that the Court proceeded "in the context of an arrest made by an officer without a warrant." The Court recognized the existence of probable cause "for the officer to arrest petitioner and charge him with driving an automobile while under the influence of intoxicating liquor." Yet the Court acknowledged that "the mere fact of a lawful arrest does not end our inquiry." Then it went on to find "special facts" in the nature of alcohol's diminishment in the human body which made the taking of the blood sample "an appropriate incident to petitioner's arrest." Nevertheless, the Court used cautionary language in summing up its decision: "It bears repeating, however, that we reach this judgment only on the facts of the present record," and warned that its holding "in no way indicates that it permits . . . intrusions under other conditions."
In 1969, three years after the Schmerber decision was handed down, the Alabama legislature enacted the Alabama Chemical Test for Intoxication Act, 1969 Acts of Ala., Act 699, Reg. Session. Section 1(a) of that Act provides:
 "Any person who operates a motor vehicle upon the public highways of this State shall be deemed to have given his consent, subject to the provisions of this act, to a chemical test or tests of his blood, breath or urine for the purpose of determining the alcoholic content of his blood if lawfully arrested for any offense arising out of acts alleged to have been committed while the person was driving a motor vehicle on the public highways of this state while under the influence of intoxicating liquor. The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving a motor vehicle upon the public highways of this State while under the influence of intoxicating liquor. The law enforcement agency by which such officer is employed shall designate which of the aforesaid tests shall be administered. Such person shall be told that his failure to submit to such a chemical test will result in the suspension of his privilege to operate a motor vehicle for a period of ninety days (90), provided however, that if such person objects to a blood test, the law enforcement agency shall designate that one of the other aforesaid tests be administered." (Emphasis added.)
Section (c) deals with a refusal to submit to the test:
 "If a person under arrest refuses upon the request of a law enforcement officer to submit to a chemical test designated by the law enforcement agency as provided in paragraph (a) of this section, none shall be given but the Director of Public Safety, upon the receipt of a sworn report of the law enforcement officer that he had reasonable grounds to believe the arrested person
had been driving a motor vehicle upon the public highways of this State while under the influence of intoxicating liquor and that the person had refused to submit to the test upon the request of the law enforcement officer, shall suspend his license or permit to drive, or the privilege of driving a motor vehicle on the highways of this State given to a non-resident or if the person is a resident without a license or permit to operate a motor vehicle in this State, the Director shall deny to the person the issuance of a license or permit for a period of forty-five (45) days after *Page 28 
the date of the alleged violation, subject to review as hereinafter provided. Provided, further, if such person is acquitted on the charge of driving a motor vehicle upon the highways of this State while under the influence of intoxicating liquor, then in that event the Director of Public Safety may, in his discretion, reduce said period of suspension." (Emphasis added.)
And, section (d) deals with the hearing afforded one whose driver's license has been suspended:
 "Upon suspending the license or permit to drive or the privilege of driving a motor vehicle on the highways of this State given to a non-resident of any person [sic], or upon determining that the issuance of a license or permit shall be denied to the person, as hereinbefore in this section directed, the Director of Public Safety or his duly authorized agent shall immediately notify the person in writing and upon his request shall afford him an opportunity for a hearing in the same manner and under the same conditions as is provided in Section 68 of Title 36 of the 1940 Code of Alabama, as amended, for notification and hearings in the cases of suspension of licenses, except that the scope of such a hearing for the purposes of this section shall cover the issues of whether a law enforcement officer had reasonable grounds to believe the person had been driving a motor vehicle upon the public highways of this State while under the influence of intoxicating liquor, whether the person was placed under arrest, and whether he refused to submit to the test upon request of the officer. Whether the person was informed that his privilege to drive would be suspended or denied if he refused to submit to the test shall not be an issue. The Director of Public Safety shall order that the suspension or determination that there should be a denial of issuance either be rescinded or sustained." (Emphasis added.)
Coming, as it did, after Schmerber, and referring to the necessity for an arrest, this statute, at least inferentially, was an interpretation by the Alabama legislature of the mandate of that case. In fact, as late as 1983, when portions of the act were amended, the requirement of an arrest in the first instance, and other references to an arrest in successive provisions, were retained in the statute. Code of 1975, §32-5-192, et seq.
According to the Court of Criminal Appeals, however, under Alabama law an arrest of the motorist is not required before extracting a sample of his blood "where there is probable cause to believe the motorist was driving while intoxicated and exigent circumstances are present." Moreover, that court concluded that "[c]ompliance with the act is not the exclusive means for admitting evidence of blood alcohol test results," citing Aycock v. Martinez, 432 So.2d 1274 (Ala. 1983); McGoughv. Slaughter, 395 So.2d 972 (Ala. 1981); and Whetstone v.State, 407 So.2d 854 (Ala.Crim.App. 1981).
Having perused each of these cases, we respectfully observe that each of them dealt with the authenticity, i.e., the proper predicate to be laid, of the evidence of a blood sample for its admission into evidence. None of those cases, however, dealt with the legal authorization for taking the blood sample in the first instance.
Here, however, that issue is squarely presented by the repeated language of § 32-5-192 pertaining to an actual arrest. The question, then, becomes whether or not a lawful arrest, which presumes probable cause to arrest, is required to allow the blood sample to be later used as evidence, or whether subsequent use as evidence is permissible on a showing of only
probable cause to arrest plus exigent circumstances, there being neither consent nor a valid search warrant in either case.
The Court of Criminal Appeals has cited a number of authorities in support of its decision that an actual arrest is not necessary when there is probable cause to believe the motorist was driving while intoxicated and exigent circumstances are present: State v. Heintz, 594 P.2d 385,286 Or. 239 (1979) (existence of probable cause to arrest sanctioned taking of blood sample; *Page 29 
however, defendant was under "arrest" as defined by Oregon statute); State v. Oevering, 268 N.W.2d 68 (Minn. 1978) (existence of probable cause to arrest sufficient (adopting rule of Cupp v. Murphy, infra)); Commonwealth v. Funk, 254 Pa. Super. 233, 385 A.2d 995 (1978) (probable cause to believe motorist driving while intoxicated); and United States v.Harvey, 711 F.2d 144 (9th Cir. 1983) (following Cupp v. Murphy,infra) (blood sample taken from motorist incapable of refusing permitted without arrest).
And there are cases contra, e.g., Schutt v. MacDuff,205 Misc. 43, 127 N.Y.S.2d 116 (N.Y.Sup. 1954) (implied consent statute permitting blood sample at direction of police officer having reasonable grounds to suspect motorist of driving while intoxicated violated due process clause of state constitution
for failure to contain provision providing for lawful arrest);accord, Holland v. Parker, 354 F. Supp. 196 (D.S.D. 1973).
We have also considered the editorial comments contained in 2 LaFave, Search and Seizure, § 5.4(b) at 517-26 (1978). It is significant that not a single case cited by the court below, in disapproving the requirement of an arrest, involved a statuterequiring a "lawful arrest." To the contrary, the court below appears to adopt as the law of Alabama the rationale of Cupp v.Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), which held that the existence of probable cause to arrest, along with exigent circumstances, in and of itself justified the search of a suspect and seizure of scrapings of his fingernails. That decision did not involve a statute either, but was based upon an application of Schmerber, supra; Chimelv. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685
(1969); and the Fourth and Fourteenth Amendments.
There is a sharp division among the jurisdictions having nostatute requiring a "lawful arrest," as to whether probable cause to arrest is sufficient grounds on which to obtain a blood sample from a motorist under an implied consent law. While a discussion of the relative merits of each position would be interesting, and perhaps helpful if this Court was without its own guidelines, nevertheless, we are bound to consider the intent of our legislature in enacting statutes, and to give credence to the plain language utilized by that body. Ex parte Jones, 456 So.2d 380 (Ala. 1984). The intent of the legislature constitutes the law, insofar as the interpretation of statutes is concerned. Champion v. McLean,266 Ala. 103, 95 So.2d 82 (1957). And it is a fundamental principle that the legislature, in enacting a statute, is presumed to have had full knowledge and information on prior and existing law on the subject of a statute. Miller v. State,349 So.2d 129 (Ala.Crim.App. 1977).
If the issue presented in the instant case had arisen under the federal constitution, and not under our state statute, perhaps the Cupp v. Murphy analysis, making probable cause to arrest sufficient, would be tenable. Or, in the absence of our statute's limiting language, we could justify the taking of the blood sample on the basis of a lawful arrest without a warrant, the basis of a lawful arrest with a warrant, or the basis of voluntary consent or other waiver. Cf. "Interpretation of Implied Consent Laws by the Courts," Traffic Institute, Northwestern University, at 25 (1972).
However, under the express terms of Alabama's implied consent statute, any motorist on the public highways automatically gives his implied consent to a test of his blood, among other things, only if he is lawfully arrested. The legislature did not prescribe any additional conditions which would equateimplied consent, such as probable cause to arrest. Doubtless, this choice was intended to meet the legislature's concern for due process of law for the later possibility of the removal of the driver's license of the motorist.
Further, if the arrested motorist refuses to submit to the test, then, "upon the receipt of a sworn report" of the arresting officer "that he had reasonable grounds to believe
the arrested person had been driving amotor vehicle . . . while under the influence of intoxicating liquor" and had refused to submit to the test, the director *Page 30 
of public safety "shall . . . suspend his license to drive." And thereafter, upon such a suspension, a hearing is provided to "cover the issues of whether a law enforcement officer had reasonable grounds to believe the person had been driving a motor vehicle upon the public highways . . . while under the influence of intoxicating liquor, whether the person wasplaced under arrest, and whether he refused to submit to the test." (Emphasis added.)
Clearly, the Alabama statute gives a procedural protection beyond that apparently mandated by federal decisions. The United States Supreme Court has indeed recognized that
 "a state may confer procedural protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a state does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that state."
Mills v. Rogers, 457 U.S. 291, 102 S.Ct. 2442, 2449,73 L.Ed.2d 16 (1982); accord, California v. Ramos, 463 U.S. 992,103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).
The implied consent law's repeated references to an arrest clearly manifest the legislature's balance of the interests represented: the state's interest in public safety and the individual's interest in personal liberty. In that connection, the observations of Justice Eager in Schutt v. MacDuff, supra,127 N.Y.S.2d at 126-27, are appropriate here:
 "[U]nder this statute, as written, an auto driver may be restrained of his liberty without due process; that is, without process, he may be stopped on the highway by an officer and, thereupon, without process and without an arrest being made, a demand may be made upon him that he accompany the officer and submit to a test to determine whether or not he is intoxicated. Of course, it would be lawful for an officer to stop a motor vehicle driver upon the highway if the officer has reasonable grounds to believe the driver is intoxicated; and it is argued that there would be no involuntary action amounting to restraint in that the driver when stopped or approached by the officer has the choice of whether or not he shall accompany the officer and submit to the test as demanded by him. Such argument falls, however, for it is clear that everyone except possibly a hardened criminal or a very wise man would be under the feeling of some duress when any demand is made upon him by an officer of the law, especially if the officer is badged and armed. The feeling is natural and proper, and this court would not want it otherwise, for there must be respect for the authority of police officers. On the other hand, conferring upon police officers the right to make a request under the guise of authority concerning one's person without specific process and without lawful arrest clearly amounts to an unlawful infringement upon one's liberty."
We conclude that the requirement of a lawful arrest in the Alabama "implied consent" statute grants to the motorist in question a procedural right, and that the failure to accord that right renders the blood sample illegal for the purpose of its admission as evidence against the motorist who objects to its admission.
The judgment of the Court of Criminal Appeals is reversed, and this cause is remanded to that court for an order consistent with this opinion. It is so ordered.
REVERSED AND REMANDED.
JONES, ALMON, SHORES, ADAMS and HOUSTON, JJ., concur. *Page 31