On Application for Rehearing

THOMAS, Judge.
The opinion of .September 26, 2014, is withdrawn,, and the following is substituted therefor.
The Huntsville-City Board of Education (“the Board”) appeals a hearing officer’s reversal of its decision to terminate^ the employment of Norma Jacobs, a tenured sixth-grade teacher at Westlawn Middle School (“Westlawn”), pursuant to the Students First Act (“the SFA”), codified at AkuCode 1975, § 16-24C-1 et seq.[1] The *932 record of the hearing before the Board reveals the following facts. ■
Jacobs was employed as a sixth-grade teacher for the 2012-2013 school year. She was assigned to Westlawn, which had been awarded a School Improvement Grant (“the SIG”) to improve the standardized test scores of the students attending the school over a three-year period. As its principal, Lynnette Alexander, explained, Westlawn was considered a “turn-around school.”' Westlawn had been in the bottom 10% of schools statewide for the eight years preceding the 2012-2013 school year. As a condition of the SIG, Westlawn was required' to provide significant amounts of professional development to its teachers, including a week-long workshop before the school year began and one hour each day of the school year.
As part of its professional-development program, Westlawn performed weekly “walk-throughs” of classes, during which the walk-through team would evaluate the teachers. During the walk-through, the team members would document their observations, and meetings were later held with the teachers to discuss the evaluations and to suggest ways to improve classroom instruction. Notes were made of the walk-through observations, and the record contains several of the walk-through notes pertaining to observations of Jacobs’s class; those notes were not provided to Jacobs or any other teacher; After the meetings, each teacher would receive a document, referred to as a “grows and glows” document, which-would highlight the positive aspects of the observation of that teacher, list the issues identified by the team, and suggest ways to improve classroom instruction. The “grows and glows” documents and are not contained in the walk-through notes.
Alexander testified that four observations of Jacobs’s class had yielded concerns about Jacobs’s teaching methods. Specifically, Alexander testified that the documentation concerning the October-24, 2012, walk-through of Jacobs’s class indicated that the students were confused about what they were supposed to be doing; that the lesson plan, strategies on “the board,” and student activity did not match; and that Jacobs had been “combative” with her students. The documentation from the November 7, 2012, walk-through indicated that Jacobs’s class suffered from a lack of student engagement, that Jacobs was not checking for understanding as students were reading, that Jacobs remained seated during the observation and failed to monitor student learning, and that Jacobs’s lesson plans were not up-to-date and did not reflect-what was happening in the classroom. On November 19, 2012, the walk-through team stated that Jacobs was appropriately displaying .student work but that “there is no evidence of strategic teaching.”
Finally, on January 10, 2013, the walk-through documentation indicated that Linda Mason, from the State Board of Education, had been a part of the team. The concerns noted by Mason included questioning whether Jacobs was properly following the discipline plan because she was having a student write a sentence 300 times as discipline; noting that, during a *933 35-minute visit to the class, no instruction was given; commenting that the students were permitted to use instructional time to telephone their parents; and complaining that it took too long for the students to get their computers out and begin class work. Mason also noted that no' Student work was displayed in the classroom; that one student was left unsupervis'ed while the class went to the bathroom; and that students, when questioned about what they were going to do in class that afternoon, responded with “Who knows?” .
The recommendation of the walk-through team on October 24, 2012, had been to provide instructional coaching to Jacobs. Lacey Lupo was assigned to provide that instructional coaching to Jacobs. According to Lupo, one main focus of professional development at Westlawn was to have the teachers learn and use 'strategic-teaching methods. According to Alexander, “[strategic teaching is a before, during, and after strategy, and it allows the teachers to check for understanding throughout the lesson.” She explained that a teacher should hot teach the lesson without checking to see that the students are learning the skill at least three times during the lesson. Alexander further noted that Westlawn had “a lot ‘ of at-risk students. At the end of the period, the important thing is mastery and that they’re gaining knowledge of that skill.”
In addition, Lupo explained, Westlawn utilized a five-step discipline plan, which did not include requiring a student to write a sentence 300 times during instructional time or sending students to the office routinely. Instead, . that plan required a teacher to institute classroom consequences and to progress to parent involvement before referring a student to the office. Alexander testified that Jacobs had the highest number of office referrals, in-school suspensions, and out-of-school suspensions in .the sixth grade.
Lupo testified that instructional coaching required her to plan lessons together with the teacher she was coaching, to model teaching strategies for that teacher, to co-teach with that teacher, and to observe that teacher to see if the techniques modeled were being utilized. Lupo said that Jacobs seemed' resistant to being coached at first; according to Lupo, it seemed as if Jacobs did not see a need for instructional coaching. Lupo said that , her early observations of Jacobs revealed a lack of student engagement, strategic teaching,- and “best,.practices.” Based on the November 7, 20Í2, evaluation, Lupo said,. Jacobs had failed to incorporate the techniques imparted during coaching. Failing to use strategic teaching, opined Lupo, was not competent teaching.
. . Mason’s .observation of Jacobs’s class on January 10,2013, was performed as apart of her assignment to provide assistance to Westlawn in complying with the SIG requirements. She testified at the hearing before the Board that the teaching she observed in Jacobs’s class on January 10, 2013, was not up to “standard.” Mason said that she observed Jacobs’s class for 30 to 35 minutes, during which time, Mason testified, no instruction- was provided to the students. Instead, ■ Mason said, “the students were up doing pretty much as they wanted to.'” Mason contrasted the lack of instruction and classroom discipline in Jacqbs’s class with other classes ■ she observed that day, stating that “[i]n other classrooms ..., students were engaged. They were in small groups or they were working in whole groups.”
On January 14,. 2013, Alexander and Lupo had a meeting regarding the January 10, 2013, walk-through evaluation with Jacobs; that meeting was transcribed, and the transcript of that meeting was offered *934 into evidence before the Board. According to the transcript, Alexander explained in the January 14, 2013, meeting that she was concerned that Jacobs was not implementing the teaching strategies Lupo had been coaching. Alexander stated that Lupo would need to move on to another teacher who needed coaching, and Lupo expressed her concern that the coaching had not resulted in changes in Jacobs’s teaching techniques. Specifically, Alexander commented that she was “not seeing the progression [of Jacobs’s skills]” and that she did not see Jacobs “willing to change and ‘try these new things”; she also stated that Jacobs’s failure to adapt her teaching style was “dámaging to'Westlawn.” Jacobs said that teaching at Westlawn was “very different from [her former school] where I was just managing behavior.” Alexander agreed to allow Jacobs to observe ánother teacher, Ms. Nevlous, but stated that she would no longer be providing one-on-one coaching through Lupo until she saw Jacobs implementing some of the techniques modeled by Lupo.
Alexander had another meeting with Jacobs on February 25, 2013. That meeting was also transcribed, and the transcript was offered into evidence before the Board. The February 25, 2013, meeting was prompted by' complaints Alexander had received from parents, including one parent complaining that her child “hate[d Jacobs’s] class so [much] that he is discussing suicide.” Alexander informed Jacobs that, based on the evaluations and the •complaints, Alexander would be dissolving Jacobs’s class and redistributing the students between the other sixth-grade .classes. Alexander explained that Jacobs would be assigned to perform math intervention to assist students who had had continuing difficulty mastering math concepts.
In the February 25, 2013, meeting, Alexander explained to Jacobs that, in Alexander’s opinion, Jacobs was “a very traditional teacher, and there is not a lot of moving around in your class. There is not a lot of creativity in your work.” Further, Alexander stated that parents had complained that “once you get a hold.on a child with behavior problems then you don’t let it go. You don’t give them chances.”
When Jacobs said that she “just want[ed] to know what she was doing wrong,” Alexander said: “[D]o you not see how ... Lupo modeled the strategies and you did not implement them?” Jacobs then remarked:
“I can’t teach the way she teaches. That’s why I went into Ms. Nevlous’s room. I have never had to teach at a school like this before. I told her that sometimes I don’t know what I am doing. She modeled. That’s fine. I had to see it done in'Ms. Nevlous’s room.”
Alexander told Jacobs at the February 25, 2013, meeting that the school had provided support for its teachers but that, despite being provided one-on-one coaching by Lupo, Jacobs had not demonstrated any changes in her teaching strategies. Alexander also explained to Jacobs that the staff had three years under the SIG to turn the school around and that the school was not in a position to continue to provide coaching support when results were not visible. Finally, Alexander stated: “If I sent a coach in for modeling, then I expect you to implement what she had modeled for you.”
On February 26, 2013, Jacobs took a day of sick leave. She did not properly enter her leave in the system for that purpose, and, as a result, no substitute was requested. Jacobs testified that "the system was not operating properly the morning of February 26, 2013, and that she had contacted the school’s clerical assistant, John- *935 na Lamelle, to report that she was sick that day; Lamelle corroborated Jacobs’s testimony on this .point. Jacobs stated that she did not need a substitute because Alexander had disbanded her class.
Alexander composed a letter on February 26, 2013 (“the February 26, 2013, letter”), reprimanding Jacobs for her failure to properly request leave; the letter stated that a copy of the letter would be placed in Jacobs’s personnel file. Alexander composed a letter on February 27, 2013 (“the February 27, 2013, letter”), explaining in writing to Jacobs that her class was being disbanded, that her students would be reassigned to other classes, and that Jacobs was being reassigned to - the position of math-intervention teacher. The February 27, 2013, letter also notified Jacobs that a copy of that letter would be placed in her personnel file.
Alexander also testified that Jacobs had not regularly participated in the weekly lesson-plan meetings held by the sixth-grade teachers. Another sixth-grade teacher, Angela Hooten, also testified that Jacobs had attended only two or three lesson-plan meetings. However, Alexander did not recommend that Jacobs’s contract be terminated at.that time, despite her lack of participation and her reassignment based on her lack of progress.
On May 14, 2013, Jacobs was supervising students on the playground with Hoo-ten and Naomi Swords, another sixth-grade teacher. According to Hooten, she, Swords, and Jacobs were standing in a triangle conversing as they watched the students playing. She said that Jacobs left the group and walked behind her. Hooten testified that she then “heard the sound of a hand connecting with a body.” She testified that the sound was loud enough to be heard over the playground noise. Hooten said that she asked Swords, who, Hooten said, was standing in a position that allowed her to see behind Hoo-ten: “[D]id what I think happen just happen?” Hooten said that Swords verified that Jacobs had hit a student.' Hooten testified that the student had exclaimed something similar to -“that hurt!” Hooten stated that it was inappropriate for Jacobs to have hit a student, noting that it violated the Board’s prohibition against corporal punishment.
Hooten testified that that evening she sent an electronic-mail message to Alexander, who had not been at the school at the time of the May 14, 2103, incident, and asked to meet with Alexander the next morning. Alexander testified that, upon being informed of the incident the following morning, she took written statements from Hooten, Swords, Jacobs, and children who witnessed the incident. She testified at the hearing that Board policy prohibited corporal punishment and that, as a requirement of the SIG, the teachers at Westlawn had been provided extensive training on how to deal with the behaviors of disruptive and difficult students. Alexander stated that Jacobs had had options other than hitting the student.
Swords testified that she saw Jacobs strike a student in the back on May 14, 2013. Swords reported that, after Jacobs struck the student, the student rubbed his back and yelled that Jacobs had hit him. According to Swords, Jacobs’s striking the student was not appropriate .under the circumstances.
The Board was provided the written statements of Hooten, Swords, Jacobs, and five students, including the student Jacobs struck, who had witnessed the events of May 14, 2013. One student indicated that Jacobs had struck the student-“in the back hard” because that student was being loud. Another student stated that the students were playing around and that “Mrs. Jacobs started yelling at [the student] and *936 then smacked [the student] on the back really hard.” A third student said that he and the student Jacobs struck were playing-and that “Mrs. Jacobs just came and slapped [the student] in the back with her hand”; that student also stated that, when Jacobs hit the student, he heard something “pop.” The student Jacobs struck stated that he was playing with another student when “Mrs. Jacobs came and hit me on the back,” The other student witness stated that he or she had not witnessed the incident because he or she had been “turned around” but stated that he or she had seen the student Jacobs struck patting his back after the incident.
Jacobs testified somewhat differently regarding the May 14, 2013, incident. She said that she was supervising students on the playground with. Hooten and Swords. Jacobs said that she observed one student, who was standing with his back toward Jacobs, and that that student had his arms around the neck of a fellow student, who was seated in front of the standing student; she said that the standing. student was “rocking back and forth” and that she thought the standing student was choking the other student. She said that she “ran to [the student]” and said, “[student], let [him] go.” According to Jacobs, the student either did not hear her or ignored her. Jacobs said that she spoke the student’s name again, and she demonstrated for the Board that she “tapped” the student on the back and told the student to let the other student go, Jacobs said that the student told her that they were just playing and that she then told the student that he should not play that way. Jacobs insisted-that she was not disciplining the student but was-instead protecting the other student, who she thought was being choked. Jacobs also- insisted that she merely tapped the student on the back and that it did not produce a sound that others could have heard.
Regarding Jacobs’s assertion that she had acted in -defense of another student, both Hooten and Swords testified that Jacobs’s striking the student was unjustified. Although Swords admitted that the students were engaging in horseplay and that she could not see exactly what the students were doing, Swords said that she did not believe that any of the students was being choked. However, on cross-examination, she admitted that it was possible that one of the students may have had his arms on another child’s neck. Hooten admitted that part of her job was to protect students and that she would prevent a child from doing something dangerous if it was within her power to do so; she admitted that, if she were in a situation where she needed to stop a student from strangling a classmate, she might put her hands on the student. However, she insisted that striking a student would not be appropriate in any circumstance.
Jacobs also testified that she was a good teacher who had been performing her teaching duties. She said that students in her class had improved their STAR scores in reading and in math. She presented as exhibits STAR-score reports indicating that the number of students at or exceeding benchmarks in her class had increased 6% in reading and 10% in math. The score reports also reflected that the students needing urgent intervention in Ja--cbbs’s class had decreased by at least half in both reading and math.
Jacobs also disputed the observations made in her classroom. She explained that on October 24, 2012, she was testing some students at the time the walk-through team evaluated her; other students, she said, were reading quietly. On November 7, 2012, she explained, the students had been having difficulty logging onto their laptops, so she was seated and *937 was helping each student log onto his or her laptop; other students, she said, were reading. Jacobs also objected to Mason’s testimony about her walk-through* of Jacobs’s classroom on January 10, 2013. Jacobs said that she had instructed the students while Mason was in the classroom. Jacobs explained that it was her practice to allow her students to use the telephone to telephone their parents to let them know of schedule changes, like the cancellation of a practice or a change in the time of an after-school activity, after returning from lunch. Furthermore, Jacobs insisted that she had assigned the 300 sentences tó a disruptive student who had been placed in her class when- he disrupted another class only after asking the assistant principal if that discipline would be appropriate; she said that he had approved her request.
Regarding her failure to attend the weekly lesson-plan meetings for1 the sixth grade, which were held on Wednesday afternoons, Jacobs said that she had attended the meetings for about a month but that she could not meet on Wednesdays because she and her daughter shared an automobile. She said that she still participated by sending electronic mail regarding the lesson plans. Jacobs also indicated that she had not arranged for a substitute teacher for her absence on February: 26, 2013, because Alexander had disbanded her class and, thus,, she did not ne,ed a substitute.
Dr. Casey Wardynski, the superintendent of the Huntsville City School System (“the superintendent”), testified that he had recommended the termination of Jacobs’s employment based upon her violation of the Board’s corporal-punishment policy' and her ineffective teaching. The superintendent noted that Jacobs had had many resources available- to her but that she had either not availed herself of them or was incapable of improving her teaching performance. When questioned regarding whether the Board had reported Jacobs to the Department of Human Resources because she had struck a student, the superintendent stated that the Board had not because, although striking the student had violated Board policy, the incident did not require the Board to report Jacobs. The superintendent was recalled to rebut Jacobs’s testimony, regarding her STAR scores; he testified that, although Jacobs’s students had improved during the school year, other sixth-grade classes showed much more improvement than hers. However, the superintendent did not present any documentary evidence to support his testimony.
On July 22, 2013, the superintendent sent Jacobs a written notice of proposed termination. That letter set out the reasons supporting' the proposed termination, including- the May 14, 2013, incident; the classroom observations on October 24, 2012, November 7, 2012, November 19, 2012, and January 10, 2013; Jacobs’s failure to implement teaching strategies..provided by her instructional coach; and Jacobs’s, failure to follow the school’s discipline plan. Jacobs requested a- termination hearing before the Board, which was held on October 31, 2013.
Before the hearing, Jacobs sent a request to counsel for the superintendent in which she sought -production of 98 categories of documents. Jacobs received 1,200 pages of documents; however, Jacobs did not receive all the documents she had requested. Jacobs -received all the documents upon which the superintendent intended to rely at the hearing, including the walk-through notes, the February 26, 2013, letter reprimanding Jacobs, and the February 27, 2013, letter notifying Jacobs that her class was being disbanded. The STAR scores were- not provided to Jacobs, *938 despite Jacobs’s request for them, because the superintendent had not listed low test scores as a basis for his recommendation that Jacobs’s employment be terminated and he did not intend to rely on those scores at the hearing.
The walk-through notes the superintendent relied upon at the termination hearing were never placed in Jacobs’s personnel 'file. The “grows arid glows” documents were also not contained in Jacobs’s personnel file; in fact, those documents were not produced and were not relied upon by the superintendent at the termination hearing. The only documents that were placed in 'Jacobs’s personnel file — the February 26, 2013, letter and the- February 27, 2013, letter — were sent by Alexander to the school system’s central office but were not actually placed into Jacobs’s personnel file until September 2013, after, the superintendent recommended the termination of Jacobs’s employment.
After the termination hearing, the Board rendered a decision terminating the employment of Jacobs. Jacobs timely sought review of thé decision, as permitted under Ala.Code' 1975, § 16-24C-6(e). Jacobs’s appeal was assigned to hearing officer Deborah Bell Paseur. See Ala.Code 1975, § 16-24C-6(g). After a hearing, at which the Board and Jacobs presented arguments of counsel, and after consideration of briefs filed by the parties, the hearing officer rendered a decision reversing the Board’s termination of Jacobs’s employment. The hearing officer specifically concluded that Jacobs was not disciplining a student but was- instead acting within her rights to act in defense of another student when she struck a student on May 14, 2013, and that the Board had violated Jacobs’s due-process rights. The hearing officer outlined the basis for her conclusion that the Board had violated Jacobs’s due-process rights thusly: the Board, through the superintendent, failed to produce documents requested by Jacobs before the termination hearing; the Board, through the superintendent, failed to have documentation promptly placed in Jacobs’s personnel file; and the Board relied on documentation that was never placed in Jacobs’s personnel file. The hearing officer also noted that,, in the case of another teacher whose employment was terminated, documentation was extensive and had been timely placed in her personnel file. Therefore, the hearing officer concluded, the Board had violated Jacobs’s right to due process and the Board’s decision terminating Jacobs’s employment should be reversed.
The Board appealed the hearing officer’s reversal of its decision to terminate Jacobs’s employment to this court, pursuant to Ala.Code 1975, § 16-24C-6(f). The Board argues that the hearing officer reweighed the testimony before the Board and substituted her judgment for that of Board on the question whether Jacobs violated Board policy by striking a student. Further, the Board argues that the hearing officer incorrectly concluded that the Board had violated Jacobs’s due-process rights.
 Section 16-24C-6(e) provides that “[djeference is [to be] given to the decision of the [Board]” by the hearing officer reviewing a decision of the Board. As we explained in Lambert v. Escambia County Board of Education, [Ms. 2120350, October 11, 2013] — So.3d -, - (Ala.Civ.App.2013), “the intent behind requiring the hearing officer to give , deference to the Board’s decision is to both place the decision-making authority with the Board and to eliminate ‘counterproductive legal challenges.’ § 16-24C-2(5), Ala.Code 1975.” This court has indicated that § 16-24C-6(e) requires that the hearing officer apply the “arbitrary and capricious” standard of *939 review to the Board’s decision. Chilton Cnty. Bd. of Educ. v. Cahalane, 117 So.3d 363, 367-68 (Ala.Civ.App.2012). This court also applied the arbitrary and capricious standard of review in Cox v. Mobile County Board of School Commissioners, 157 So.3d 897, 899 (Ala.Civ.App.2013). The arbitrary and capricious standard of review is meant to be extremely deferential to the Board’s decision; put another way, a “hearing officer ... [is] required to afford deference to [a] decision of the Board, even if he [or she] would have reached a different result than did the Board.” Cahalane, 117 So.3d at 368.
On rehearing, Jacobs points out that the parties in Cahalane had agreed that the hearing officer was required to apply the arbitrary and capricious standard of review. Id. at 367. She also notes that this court simply applied the arbitrary and capricious standard in Cox without determining whether the SFA truly provided for such review. Thus, she contends that this court should consider whether the SFA’s use of the term “deference,” alone, mandates that the hearing officer apply an arbitrary and capricious standard or whether, because the SFA does not contain the phrase “arbitrary and capricious,” the legislature intended to do away with that form of review. Other than contending that the legislative history would support the conclusion that the legislature rejected the application of the arbitrary and capricious standard of review because that phrase does not appear in the SFA, Jacobs provides no insight into what standard the legislature intended to have the hearing office or this court apply instead. We note again that the legislature has specifically stated that it intended for the SFA to “[r]estor[e] primary authority and responsibility for maintaining a competent educational workforce” -to school boards, § 16-240-2(2), and further stated that its objective was to “[e]liminat[e] costly, cumbersome, and counterproductive legal challenges to routine personnel decisions by simplifying administrative adjudication and review of contested personnel decisions.” § 16-240-2(5) Because we have applied the arbitrary and capricious standard to teacher-termination appeals arising under the SFA based on its historical application to the fact-finder’s decisions in teacher-termination cases, see Cahalane, 117 So.3d at 366 (collecting cases), and because- of what we perceive to be the legislature’s intent that personnel decisions of school boards be given deference to support the legislature’s stated objective in the SFA of placing control over maintaining a competent teaching force with those boards, we reject Jacobs’s contention that the declaration in the SFA that the decision of a school board be given deference indicates that the legislature desired that a less deferential standard of review than - “arbitrary and capricious” govern a hearing officer’s review of an appeal from a school board’s decision.
As noted, the Board argues that the hearing officer failed to give the required deference to its decision that Jacobs’s employment should be terminated for, among other reasons, the fact that she struck a student on May 14, 2013, in violation of Board policy prohibiting the use of corporal punishment. The hearing officer concluded that Jacobs was not disciplining a student and, in fact, was justified in using force against the student because she was defending another person, as was her right under Ala.Code 1975, § 13A-3-23(a). Section 13A-3-23(a) provides, in pertinent part: “A person is justified in using physical force upon another person in order to defend himself- or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he *940 or she reasonably believes to be necessary for the purpose.” Section 13A-3-23(d) further provides that “[a] person who uses force ... as justified and permitted in this section is immune from criminal prosecution and civil action for the use of such force, unless the force was determined to be unlawful” Based on that provision, Jacobs argued, and the hearing officer agreed, that Jacobs’s employment could not be terminated for using' reasonable force to protect a student whom she thought was being choked.
We first dispense with the argument that § 13A-3-23(d) provides immunity from an administrative proceeding that results from, the use of physical force in self-defense or in defense of another. Indeed, § 13A~3-23(d) provides immunity from criminal prosecution and civil action for a person who has lawfully used physical force in defense of himself, herself, or another. However, § 13A-3-23(d) does not include the phrase “administrative proceedings” within the list of proceedings from which a person justified in using force under § 13A-3-23(a) is immune. Our legislature has provided immunity from criminal prosecutions, civil actions, and administrative proceedings in other statutes. See Ala,Code 1975, § 22-19-177(a) (providing that a person who acts in accordance with or attempts in good faith to act in accordance with an anatomical-gift law of this or another state “is not liable for- the act in a civil action, criminal prosecution, or administrative proceeding”). In contrast to § 22-19-177(a), § 13A-3-23(d) does not contain the phrase “administrative proceedings.” When construing a statute, Alabama courts- have often relied on the maxim “expressio unius est exclusio alterius,” which is, in simpler terms, the principle that “where a statute enumerates certain things on which it is to operate, the statute is to be construed as excluding from- its effect all those things not expressly mentioned.” Champion v. McLean, 266 Ala. 103, 112, 95 So.2d 82, 92 (1957); see also Ex parte Holladay, 466 So.2d 956, 960-61 (Ala.1985). Because § 13A-3-23(d) provides immunity from only criminal prosecution and civil action, we cannot-agree that the statute also provides Jacobs immunity from an administrative proceeding resulting from her decision to use physical force.
We now turn to Jacobs’s contention that her testimony that another student was being choked was undisputed before the Board and that the Board is attempting to “manufacture a factual dispute regarding whether Jacobs saw a student being choked.” The testimony and documentary evidence before the Board indicated that Jacobs had struck a student on May 14, 2013. Jacobs did not deny that she had made physical contact with the student. She insisted that she had only “tapped” the student and that she had done so in defense of another student whom she believed was being choked. Swords witnessed Jacobs’s striking the student, and she testified.that, although horseplay was going on and she could not clearly see what the students were doing, she did not see any student choking another student. Hootén and Alexander testified that hitting the student was not appropriate under any circumstances, and that discipline methods other than striking, the student had been available to Jacobs.
Despite the fact that the ore ten-us rule does not provide the standard of review in teacher-termination cases, we find its application to be analogous to the application of the deference afforded the Board under § 16-24C-6(e); as the fact-finder, the Board is entitled to deference on its resolution of questions of disputed fact much like the trial court is afforded deference on its resolution of questions of *941 disputed fact. One basic tenet underlying the deference afforded a fact-finder is that entity’s ability to “observe the appearance, behavior, and demeanor of live witnesses” and to make a determination regarding their credibility. See Alabama Bd. of Exam’rs in Psychology v. Hamilton, 150 So.3d 1085, 1088 (Ala.Civ.App.2013) (stating that, in an appeal of an agency decision under the Alabama Administrative Procedure Act, codified at Ala. Code 1975, § 41-22-1 et seq„ the administrative-law judge is entitled to deference based, in part, on his or her superior ability to observe the witnesses’ demeanor and assess their credibility); see .also Darnall v. Hughes, 17 So.3d 1201, 1207 (Ala.Civ.App.2008) (quoting J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1185-86 (Ala.Civ.App.2007)). The fact that one witness is the sole witness to testify to certain facts does not require the fact-finder to believe the testimony of that witness. Wells v. Wells, 69 So.3d 192, 196-97 (Ala.Civ.App.2011) (explaining that the testimony of one, sole witness as to the competency of the grant- or of a deed at the time the deed was executed was not required to be accepted because- the trial court was permitted to evaluate the demeanor and credibility of that witness and to reject that testimony).
The Board was permitted to consider Jacobs’s demeanor and weigh the facts as she reported them against the testimony of- Hooten and Swords and the statements of the student witnesses to the incident. The Board considered the testimony and the documentary evidence, and it could well have determined that Jacobs’s striking the student was unnecessary under the circumstances and that the force she exérted was excessive given the situation presented. Furthermore, the Board could have determined that Jacobs violated the Board’s- corporal-punishment policy by striking the student.
Jacobs argues in defense of the hearing officer’s decision that the Board, as a mandatory reporter,' see Ala.Code 1975, § 26-14-3(a), failed to report her to the Department of Human Resources. It appears that Jacobs is contending that, in order to conclude that she violated the corporal-punishment policy, the Board must have determined that she committed child abuse, because, as Jacobs states in her brief, “ ‘[ajbuse’ is broadly defined to include any ‘harm’ or ‘threatened harm’ to a child’s health or welfare.” See Ala.Code 1975, § 26-14-1(1) (defining' “abuse”). However, as the superintendent explained in his testimony, corporal punishment is permitted in many school systems in Alabama, see Ala.Code 1975,. § 16-28A-1 (“Teachers are hereby given the authority and responsibility to use appropriate means of discipline up to and including corporal punishment as may be prescribed by the local board of education.”), and its use is not, in most circumstances, considered to be “abuse.” See Ala.Code 1975, § 16-28A-2 (exempting public-school teachers from the application of Title 26 in relation to corporal punishment administered in a manner consistent with the written policies of the employing board of education).[2] Because the Board’s .policy prohibited the use of corporal punishment in the Huntsville city schools, Jacobs would arguably not be protected by the immunity provided in § 16-28Á-2. How *942 ever, we cannot agree that Jacobs’s striking a student would amount to “abuse” such that the Board was required to report Jacobs before it could determine that she had violated the Board’s policy. ■
The Board’s decision was due deference by the hearing officer. Although she haight have disagreed with the Board’s decision, the hearing officer was not permitted to reweigh the testimony and to supplant the Board’s determinations regarding the facts underlying the May 14, 2013, incident with her own.' Because the facts were such that they could be viewed differently by different persons, the hearing officer could not have determined that the Board’s decision was arbitrary. Cahalane, 117 So.3d at 368 (quoting Ex parte Dunn, 962 So.2d 814, 816 (Ala.2007) (quoting in turn Board of Sch. Comm’rs of Mobile Cnty. v. Dunn, 962 So.2d 805, 809 (Ala.Civ.App.2006), rev’d on other grounds, Ex parte Dunn, 962 So.2d at 824)) (“As noted above, our supreme court has stated that, ‘[wjhere “reasonable people could differ as to the wisdom of [the Board’s] decision[,] ... the decision is not arbitrary.” ’ ”). Therefore, we cannot agree with Jacobs or the hearing officer that Jacobs’s action in striking the student could not be considered to violate the Board’s policy banning the use of corporal punishment in the Huntsville city schools, and, therefore, we conclude that Jacobs’s actions could give rise to the termination of Jacobs’s employment by the Board.
We turn now to whether, as the hearing officer concluded, the Board violated Jacobs’s due-process rights. . Generally, “ ‘[t]he essential requirements of due process ... are notice and an opportunity to respond. The tenured public employee is entitled to written notice of the charges against him, an explanation of the employer’s evidence, and an opportunity to present his side of the story.’ ” Frizzell v. Autauga Cnty. Bd. of Educ., 972 F.Supp. 564, 565 (M.D.Ala.1997) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). As our supreme court explained in Ex parte Jackson, 881 So.2d 450, 453 (Ala. 2003), which involved the application of the former Teacher Tenure Act, “[d]ue process requires notice and a hearing,” and advance notice to a teacher of the documents to be used in his or her termination hearing and a hearing at which the teacher is given a “full opportunity to- respond to the factual content of those documents” are “all that is required for due process.”
The hearing officer concluded that Jacobs was not provided sufficient due process because (1) certain documents were never placed in her personnel file and yet were used at the termination hearing, (2) certain documents were placed in her personnel file in September 2013, after the superintendent had recommended the .termination of Jacobs’s employment, and (3) the superintendent did not provide Jacobs with all the documents she requested in her discovery request, including, specifically, the “grows and glows” documents and the STAR-score reports.
Regarding the hearing officer’s concerns that Jacobs’s discovery requests were not honored, we note that the former Teacher Tenure Act required the parties to “submit to the hearing officer, with a copy to the opposing party, documents supportive of, and in contravention to, the action, as well as a list of witnesses to be called at [the] hearing.” See former Ala. Code 1975,. § 16-24-10(a). The SFA does not contain a similar provision. However, as noted above, the superintendent provided significant discovery to Jacobs, and he provided all documents upon which he intended to rely at the hearing. We find no basis for the hearing officer’s determina *943 tion that the superintendent was required to' honor all discovery requests by Jacobs; there is no statutory requirement that the Board permit discovery or that a superintendent produce any documents to a teacher facing a termination hearing. Due process requires, at most, that the teacher be provided some advance notice of the evidence to be used against him or her. Because the superintendent did not intend to rely on the STAR scores and because he did not intend to rely on the “grows and glows” documents, the superintendent was not required to produce those documents. The superintendent met the requirements of due process by producing to Jacobs those documents upon which he intended to rely at the hearing. Ex parte Jackson, 881 So.2d at 453 (“Jackson was given advance notice of all documents to be used in her termination hearing.... Because she received all that is required for due process, her due-process claim is without merit.”). ' Therefore, we agree with the Board that the failure to honor all of Jacobs’s discovery requests was not a violation of Jacobs’s due-process rights.
We reach a similar conclusion with regard to the hearing officer’s determination that the failure to include certain documents in Jacobs’s personnel file and the failure to “timely” place other documents in Jacobs’s personnel file amounted to a due-process violation. This court concluded in State Tenure Commission v. Jackson, 881 So.2d 445, 449 (Ala.Civ.App.2003), that Ala.Code 1975, § 16-22-14(e), which states that “[a]ny materials pertaining - directly to work performance may be placed in the record of the [teacher],” “afford[s] discretion to school administrators in making entries in [a teacher’s] personnel record— [the statute] permit[s] an administrator to include in a teacher’s personnel file something less than every complaint, regardless of merit, made against the teacher.” On certiorari review of our decision in Jackson, our supreme court considered and rejected the argument that the failure to place employment-performance records in a teacher’s personnel file prevents their use at a termination hearing. See Ex parte Jackson, 881 So.2d at 453.
The teacher in Ex parte Jackson had argued that the Mobile'County Board of School Commissioners had violated her rights to due process by using “illegally obtained” evidence at her termination hearing because that board had relied on documents relating to her employment performance that had not been contained in her personnel file. Ex parte Jackson, 881 So.2d at 452. According to the teacher in Ex parte Jackson, § 16-22-14(e) required that all documents relating to a teacher’s employment performance be placed into her personnel file in order to be retained and in order for the documents to be admissible at a termination hearing. Id. at 452. After discussing the confusion created by the language in § 16-22-14, which statute our supreme court described as “quite confusing and internally inconsistent,” id., our supreme court determined that, even assuming that the retention of employment-performance records outside a teacher’s personnel file was a violation of § 16-22-14(e), the fact that the teacher had been provided “advance notice of all documents to be used in her termination hearing” and “a hearing at which she had a full opportunity to respond to the factual content of those documents” prevented her from asserting a meritorious due-process claim. Id. at 453.
Based on Jackson and Ex parte Jackson, we cannot agree that the failure to place all documents relating to Jacobs’s employment performance into her personnel file.before the superintendent recommended terminating her employment *944 amounts to a due-process violation. Section 16-22-14(e) still contains the permissive language discussed in Jackson, and Ex parte Jackson still stands for the proposition that, provided a teacher is given advance notice of the documents that will be used against him or her and a hearing at which he or she is afforded an opportunity to dispute the information contained in those, documents, the teacher has received due process of law. The hearing officer’s-misgivings aside, the superintendent’s use of documents that were not included in Jacobs’s personnel file and the delay in placing certain documents in . Jacobs’s personnel file did not result in a due-process violation.
In her brief, Jacobs asserts several arguments regarding her contention that her due-process rights were violated by the procedure set out in the SFA.Specifically, she contends that the Board- is not a neutral decision-maker and is, in fact, an adverse party to the teacher in a teacher-termination proceeding. She also .argues that her due-process rights were infringed when the Board’s attorney prosecuted the terrhination hearing and that the Board evidenced’ bias and favoritism by seeking legal advice from its attorney during the hearing and by ruling unfavorably on her objections. Jacobs contends that her alternative arguments further support the hearing officer’s determination that the Board’s decision violated Jacobs’s' due-process rights and must be overturned. See McMillan, Ltd. v. Warrior Drilling & Eng’g Co., 512 So.2d 14, 25 (Ala.1986) (opinion on rehearing) (quoting 9 J. Moore and B, Ward, Moore’s Federal Practice ¶ 204.11[2] (2d ed. 1985)) (“ ‘[A]n appellee, though he files no cross-appeal or cross-petition, may offer in support of his judgment any argument that is supported by the record, whether it was ignored by the court below or flatly rejected.’ ”). We note that some of Jacobs’s arguments appear to challenge the constitutionality of the procedure set out in the SFA as being viola-tive of Jacobs’s right to due process. We cannot entertain those arguments as an alternative basis for upholding the hearing officer’s decision because a constitutional challenge to the SFA could not have been made in the appeal from the Board’s termination decision. See Wright v. City of Mobile, 170 So.3d 656, 660 (Ala.Civ.App. 2014). -We can, however, consider the propriety of the Board’s attorney serving as an attorney for the superintendent during the termination hearing and Jacobs’s allegation that the Board demonstrated bias against ' her as potential alternative grounds supporting the hearing officer’s decision that the decision of the Board should be overturned because Jacobs had been denied her right to due process.
Jacobs contends that we may. affirm the decision of the hearing officer on the ground that Jacobs was denied due process because the attorney for the Board served as the superintendent’s prosecutor and also advised the Board and provided it a script to follow during the hearing. Our review of the record indicates that the attorney for the Board did not provide legal advice to the Board during the proceedings. The script about which Jacobs complains is contained in the record, and it cannot be said to contain legal advice; instead, it sets out the procedure to be used and basic protocol, like the swearing of witnesses and “invoking the rule.”. The fact that the Board was provided a “script” of how to conduct the hearing is simply not sufficient to conclude that the Board was provided legal advice. Furthermore, our supreme court has “hesitate[d] to affirm” that the -use of an assistant city attorney to prosecute the termination of a city employee’s-employment-before the city council violated due process. City of Huntsville v. *945 Biles, 489 So.2d 509, 513 (Ala.1986). We are likewise uncomfortable with stating that the use of the Board’s attorney to prosecute the termination proceeding violated Jacobs’s due-process rights in the present appeal.-
Jacobs further insists that the Board’s actions showed favoritism toward the superintendent. Jacobs complains that allowing the superintendent to testify regarding the STAR scores despite his not producing those scores was evidence of bias or favoritism. She also complains that all of her evidentiary objections were overruled, which, she says, evidences bias. However, Jacobs does not develop her argument beyond mere statements that the Board evidenced bias, nor does she support' her argument regarding bias with citations to authority; accordingly, we need not entertain the argument further. See White Sands Grp., L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008) (“Rule 28(a)(10) [, Ala. R.App. P.,] requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party’s position. If they do not, the arguments are waived.”); see also Bishop v. Robinson, 516 So.2d 723, 724 (Ala.Civ.App.1987) (quoting Thoman Eng’g, Inc. v. McDonald, 57 Ala.App. 287, 290, 328 So.2d 293, 294 (Ala.Civ.App.1976)) (noting that an appellant should “present his issues ‘with - clarity- and without ambiguity* ” and “fully express his position on the enumerated issues” in the argument section of his brief); accord United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990) (“It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel’s work ... and put flesh on its bones.”).
The hearing officer correctly noted that she could not substitute her own judgment for that of the Board,- and she specifically declined to discuss the facts related to Jacobs’s fitness as a teacher. Instead, the hearing officer concluded that the Board had violated Jacobs’s due-process- rights, which conclusion this court has rejected. We have also rejected the hearing officer’s conclusions that Jacobs’s striking a student on May 14,2013, was not the administration of discipline and that Jacobs’s conduct was therefore not a sufficient basis for the termination, of her employment on the ground that she had violated the Board’s policy prohibiting corporal punishment. Accordingly, we reverse the decision of the hearing officer reversing the decision of the Board to terminate Jacobs’s employment. ■
APPLICATION GRANTED; OPINION OF SEPTEMBER 26, 2014, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, MOORE, and DONALDSON, JJ., concur.

. Although the notice of appeal and the appellant’s brief list both the Board and Dr. Casey *932 Wardynski, the superintendent of the Hunts-' ville City School System, as appellants, it is apparent that the Board is the proper appellant. Under the parlance of the SFA, the superintendent of the Huntsville City School System is the “chief executive officer" responsible for recommending the termination of the employment of a tenured teacher like Jacobs, but the Board is the "governing board” or "employer” responsible for making the ultimate decision regarding termination. See Ala,Code 1975, § 26-24C-6. We have restyled the appeal accordingly.

.. We note that Title 26 includes several statutes that would have no application in a,situation involving the administration of corporal punishment by a public-school teacher. We infer that the legislature intended to exempt public-school teachers who properly administer corporal punishment from being considered to. have abused a child under Ala.Code 1975, § 26-14-1 et seq., which defines "abuse" and provides for the reporting of suspected abuse.